IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | 8:10CR50 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| TOSHA BYARS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the court on the defendant's motion to strike surplusage from the indictment.  Filing No. 33.

### BACKGROUND

The defendant was indicted on February 18, 2010, for possession with intent to distribute more than 5 grams of a mixture or substance containing a detectable amount of cocaine base ("crack cocaine").  Filing No. 1.  On June 9, 2010, pursuant to a plea agreement, she entered a plea of guilty to the indictment. Filing No. 17, minute entry; Filing No. 20, Plea Agreement.  The court accepted the plea but withheld acceptance of the plea agreement pending the preparation of a presentence investigation report ("PSR") by the United States Probation Office.  Filing No. 17.

On September 8, 2010, the defendant filed a motion to withdraw the plea, contending that the recently-enacted Fair Sentencing Act ("FSA"), Pub. L. No. 111-220, 124 Stat. 2372 (Aug. 3, 2010), applied to her case.  Filing No. 21, Motion; Filing No. 22, Brief.  The FSA Sentencing Act became effective on August 3, 2010, and increased the quantity necessary to trigger a mandatory minimum penalty of 5 years and maximum of 40 years for the crime from 5 grams to 28 grams.  *Id*. (codified at 21 U.S.C. § 841(b)(1)(B)(iii) (2010).  The record indicates that Ms. Byars possessed 6.9 grams of crack.  If the FSA

were applicable, the defendant's statutory range of imprisonment would be 0 to 20 years, rather than 5 to 40 years.  *Id*.  In response, the government offered no objection to the motion and stated that it was in the best interests of justice to grant the motion.  Filing No. 23.

At an on-the-record conference in chambers on November 5, 2010, the court indicated that the motion to withdraw the plea had been was granted.  Filing No. 31, Transcript (Tr.) at 2.  The court stated "it's my understanding that the government is tendering a plea agreement to the defendant, and the plea agreement would allow the defendant to enter a plea to an information that would simply charge her with possession of crack cocaine and have no statutory minimum," but that the plea agreement, a Rule 11(c)(1)(C) agreement that would be binding on the court, would require the defendant to agree to a sentence under the sentencing guidelines in effect at the time she committed the offense "which would take away the Court's discretion to use the current sentencing guidelines."[1]  *Id*. at 2-3.  The court explained that the government had essentially conceded applicability of the FSA "because they're willing to allow her to plead guilty to the charge with—with the statutory minimum that is in conformity with the new law," but noted that the government was "not willing to allow Ms. Byars to be sentenced under the new sentencing

---

[1]Under Fed. R. Crim. P. 11(c)(1)(C), a plea agreement may specify that an attorney or the government will agree that a specific sentence or sentencing range is the appropriate disposition for a case and such a recommendation or request will bind the court once the court accepts the plea agreement.  Fed. R. Crim. P. 11 (c)(1)(C).  The court may accept the agreement, reject it, or defer decision until the court has reviewed the presentence report.  Fed. R. Crim. P. 11(c)(3)(A).  If the court rejects a Rule 11(c)(1)(C) plea agreement, the court must inform the parties that the court rejects the plea agreement; advise the defendant personally that the court is not required to follow the plea agreement; give the defendant an opportunity to withdraw the plea; and advise the defendant personally that if the plea is not withdrawn, the court may dispose of the case less favorably toward the defendant than the plea agreement contemplated.  Fed. R. Civ. P. 11(c)(5)(A)-(C).  Courts are not obligated to accept plea agreements and have discretion to reject those which are deemed involuntary or unfair.  *United States v. Kling*, 516 F.3d 702, 704 (8th Cir. 2008); *see also Virgin Islands v. Walker*, 261 F.3d 370, 375 (3d Cir. 2001) (stating that "[a] sentencing court can, of course, reject the results of a plea negotiation if it concludes that the resulting agreement is not in the best interest of justice").

guidelines rather than the old sentencing guidelines."[2]  *Id*. at 3-4.  Because the court had

expressed reservations about the fairness of accepting the 11(c)(1)(C) agreement, the

government indicated that it would not file an information unless it was clear that the court

would accept a binding agreement with a sentence under the pre-amendment, harsher

Guidelines.  *Id*. at 4.  The court noted that the question for the government was whether

the government was "willing to allow the Court to accept the plea to the information with

the understanding that the Court may not accept the 11(c)(1)(C) plea agreement" and

agreed to continue the matter to allow the parties to pursue their options.  *Id*. at 5.

The government has not filed an information.  The defendant now asks the court to

strike the reference to quantity in the original indictment, contending that the quantity

reference is superfluous and irrelevant in light of the FSA.   The government opposes the

defendant's motion for the reasons stated in opposition to other similar motions in this

court.  *See, e.g.*, *United States v. Parks*, No. 8:10-CR-225, Filing No. 43, Government's

Brief in Opposition to defendant's Motion to Strike Surplusage from Indictment.  It contends

that the FSA does not apply to the defendant's offense because courts are required under

1 U.S.C. § 109 (the so-called "savings clause"), to apply the criminal statute in effect at the

time of the defendant's offense unless Congress expressly provides otherwise.[3]  *Id*. at 3-4.

---

[2]Under the Guidelines in effect prior to November 1, 2010, the defendant's Guidelines sentencing range would have been 37-46 months, at total offense level 21, assuming criminal history category I.  U.S.S.G. § 2D1.1(c)(8) (2009).  Under the Guidelines that went into effect on November 1, 2010, which incorporated emergency amendments to conform the Guidelines to the FSA, a quantity of 6.9 grams of crack cocaine would result in a base offense level of 18 and the sentencing range, after adjusting downward by 3 levels for acceptance of responsibility, of 18 to 24 months.  U.S.S.G. § 2D1.1(c)(11) (2010).

[3]The savings clause provides:

The repeal of any statute shall not have the effect to release or extinguish any penalty, forfeiture, or liability incurred under such statute, unless the repealing Act shall so expressly provide, and such statute shall be treated as still remaining in force for the purpose of sustaining any proper action or prosecution for the enforcement of such penalty, forfeiture, or liability.

1 U.S.C. § 109.

It argues that the quantity allegation remains relevant since the harsher penalties set out in the statute as it existed at the time of the offense apply to the defendant's case, taking the position that a defendant charged with, but not yet convicted of or sentenced for, a crack cocaine offense is subject to the mandatory minimum and maximum sentences in force at the time he committed the crime, that is, the pre-FSA statute that applied a 100-to-1 ratio of penalties between crack and powder cocaine. *Id.* at 6-9*; see* 21 U.S.C. § 841(b)(1)(A)(iii) & (B)(iii) (2009).

The question before the court is whether defendants who were charged prior to the Fair Sentencing Act's effective date, but who have not been convicted or sentenced (i.e., cases in the pipeline), should receive the benefit of the lower penalties provided in the FSA. For the reasons discussed below, the court finds the FSA is applicable to the defendant's offense.[4] Accordingly, the court finds that the reference in the indictment to a quantity of over 5 grams of crack cocaine is irrelevant and should be stricken.

## DISCUSSION

References in an indictment to sentence enhancement factors "are 'mere surplusage' and 'may be disregarded if the remaining allegations are sufficient to charge a crime.'" *United States v. Bates*, 77 F.3d 1101, 1105 (8th Cir. 1996) (quoting *United States v. Washington*, 992 F.2d 785, 787 (8th Cir. 1993). Facts that alter the maximum

---

[4]Notably, to date, there have been no circuit court opinions dealing with the application of the FSA to defendants in the same position as this defendant––i.e., who were convicted and sentenced after the FSA's effective date for offenses committed before that date. *See United States v. Green*, No. 6:08-cr-270, slip op. at 2 (M.D. Fla. Jan. 7, 2011). There are, however, numerous district courts that have ruled on the issue, some finding that the FSA should be applied in these circumstances and some holding otherwise. *See, e.g., id.* (collecting cases in attachment) (available at http://sentencing.typepad.com/sentencing_law_and_policy/2011/01/a-partial-account- of-deep-split-over-application-of-fsas-new-statutory-terms-to-pipeline-cases. html). The Eighth Circuit Court of Appeals has stated that the FSA is not retroactive in cases involving defendants either convicted or sentenced before the FSA became effective. *See United States v. Spires*, 2011 WL 93826 (8th Cir. Jan. 12, 2010); *United States v. Brewer*, 624 F.3d 900, 909 n.7 (8th Cir. 2010).

penalty function as traditional elements of a crime.  See *Harris v. United States*, 536 U.S. 545, 560-61 (2002); *United States v. Turner*, 603 F.3d 468, 471 (8th Cir. 2010) (drug quantity is an element of the offense when it increases the relevant maximum punishment). The government has a constitutional obligation to charge each element in the indictment, submit each element to the jury, and prove each element beyond a reasonable doubt. *Harris*, 536 U.S. at 557; *see also Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

The statute that criminalizes drug possession and distribution, 21 U.S.C. § 841, is structured to provide three tiers of punishment, depending on the drug quantity involved in the offense.  *See* 21 U.S.C. § 841 (b) (1) (A)(iii) (10 years to life); § 841(b)(1)(B) (iii) (5 to 40 years); 21 U.S.C. § 841(b)(1)(C) (no minimum and a maximum sentence of 20 years regardless of quantity).  The FSA increased the quantity of crack cocaine that triggers a 5-year to 40-year sentence from 5 grams to 28 grams and the quantity that triggers a 10-years to life sentence from 50 grams to 280 grams.[5]  *Compare* 21 U.S.C. § 841(b)(1)(B)(iii) (2008) *with* 21 U.S.C. § 841(b)(1)(B)(iii) (2010).  It also eliminated the 5-year mandatory minimum sentence for simple possession of crack.  21 U.S.C. § 844(a) (2010).  Some penalties were increased, as well.  *See, e.g.*, Fair Sentencing Act, Pub. L. 111-220, § 4, 124 Stat. 2372, 2372 (codified at 21 U.S.C. § 841(B)(1)(b) (2010)) (increasing fines); § 5, 124 Stat. 2372, 2372-73 (directing the Sentencing Commission amend the Guidelines to add a two-level Guideline increase if a defendant used, threatened or directed the use of

---

[5]Congress selected 28 grams as the trigger for the five-year mandatory minimum because the Sentencing Commission and other experts have concluded that less than one ounce is a retail/user-level quantity, while more than one ounce is the quantity sold by wholesalers.  *See* Public Comment Letters Received by the United States Sentencing Commission in Response to Request for Public Comment on Proposed Amendment and Issues for Comment (Fair Sentencing Act of 2010), 75 Fed. Reg. 54700 (October 2010), correspondence from Sen. Richard Durbin to Hon. William Sessions dated Oct. 8, 2010 (available at http://www.ussc.gov/Meetings_and_Rulemaking/Public_Comment/20101013/index.cfm).

violence) (codified at 28 U.S.C. § 994 (2010); § 6, 124 Stat. 2372, 2373, (directing the Commission to provide a two-level increase for a variety of circumstances including bribery and "super-aggravating factors").  In addition, Congress provided emergency authority to the Sentencing Commission to promulgate changes to the Guidelines and "to make such conforming amendments to the Federal sentencing guidelines as the Commission determines necessary to achieve consistency with other guideline provisions and applicable law" as "soon as practicable, and in any event not later than 90 days after the date of enactment of this Act."  *Id*., § 8, 124 Stat. 2372, 2374.

Pursuant to that authority, the Sentencing Commission issued temporary emergency amendments effective November 1, 2010.  *See* Notice of a Temporary Emergency Amendment to Sentencing Guidelines and Commentary, 75 Fed. Reg. 66188-02, 66191, 2010 WL 4218801 (F.R.) (Oct. 27, 2010) (noting that to account for statutory changes, "the amendment conforms the guideline penalty structure for crack cocaine offenses to the approach followed for other drugs, i.e., the base offense levels for crack cocaine are set in the Drug Quantity so that the statutory minimum penalties correspond to levels 26 and 32," and other offense levels are established by extrapolating upward and downward).  The Commission noted that "[c]onforming to this approach ensures that the relationship between the statutory penalties for crack cocaine offenses and the statutory penalties for offenses involving other drugs is consistently and proportionally reflected throughout the Drug Quantity Table." *Id*.

Although both the mandatory minimum statutes and the Guidelines calibrate punishment of drug traffickers according to quantity, the Supreme Court has acknowledged that statutory mandatory minimum sentences are both structurally and functionally at odds

with sentencing guidelines and the goals the Guidelines seek to achieve, noting that "the guidelines produce a system of finely calibrated sentences with proportional increases whereas the mandatory minimums result in 'cliffs.'" *Neal v. United States*, 516 U.S. 284, 291 (1996). Nonetheless, the Supreme Court has continued to affirm the scheme, leaving it to Congress to correct its disparities. *Id*. at 295-96 (stating that, although there was little logic to defend differences in statutory and Guidelines treatment of LSD quantities, "Congress, not this Court, has the responsibility for revising its statutes" and noting that "[w]ere we to alter our statutory interpretations from case to case, Congress would have less reason to exercise its responsibility to correct statutes that are thought to be unwise or unfair").

Congress's stated goal in enacting the FSA was "to restore fairness to Federal cocaine sentencing." Preamble, Fair Sentencing Act of 2010, Pub. L. 111-220, 124 Stat. 2372 (Aug. 3, 2010). The passage of the FSA was the culmination of more than 15 years of discussion and policy debate over the harsh crack penalties in the Anti-Drug Abuse Act of 1986. *See* David Yellen, *The Sentencing Commission Takes on Crack, Again*, 20 Fed. Sent. R. 227, 227, 2008 WL 4489732, **2 (April 2008). The Sentencing Commission had repeatedly urged Congress to reform crack penalties because they did not effectively comport with the purposes of sentencing and failed to reflect the relative culpability of drug offenders. *See, e.g.*, United States Sentencing Commission, *Report to Congress: Cocaine and Federal Sentencing Policy* (May 2007) ("2007 Report"); United States Sentencing Commission, *Report to Congress: Cocaine and Federal Sentencing Policy* (May 2002) ("2002 Report"); United States Sentencing Commission, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (Apr. 1997) ("1997 Report"); United States

Sentencing Commission, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (Feb. 1995) ("1995 Report").   The Supreme Court   acknowledges that "the crack/powder disparity produces disproportionately harsh sanctions, i.e., sentences for crack cocaine offenses 'greater than necessary' in light of the purposes of sentencing set forth in § 3553(a)."   *Kimbrough v. United States,* 552 U.S. 85, 110; *Spears v. United States*, 129 S. Ct. 840, 843 (2009) (per curiam).

The FSA was enacted because it had become clear that there was no evidentiary basis for the 100-to-1 crack/powder ratio and to remedy the racially discriminatory impact of the ratio.  *See, e.g.,* 155 Cong. Rec. S10488-01, S10491, 2009 WL 3319524 (daily ed. Oct. 15, 2009) (statement of Sen. Richard Durbin noting that "the crack/powder disparity disproportionately affects African Americans" and stating "[w]e now know the assumptions that led us to create this disparity were wrong."); *id*. at *S10492 (statement of Sen. Patrick Leahy that "the criminal justice system has unfair and biased cocaine penalties that undermine the Constitution's promise of equal treatment for all Americans"); *id*. (statement of Sen. Jeff Sessions that "the current system is not fair" and "we are not able to defend the sentences that are required to be imposed under the law today"); 156 Cong. Rec. H6196-01, *H6198, 2010 WL 2942883 (daily ed. July 28, 2010) (statement of Rep. James E. Clyburn that the 100-to-1 ratio was "unjust and contrary to our fundamental principles of equal protection under the law"); *H6199 (statement of Rep. Jackson Lee that "[t]his disparity made no sense when it was initially enacted, and makes absolutely no sense today," and acknowledging that "the current 100 to 1 penalty structure undermines various congressional objectives set forth in the Anti-Drug Abuse Act of 1986" in targeting federal resources at low-level crack cocaine users and dealers); *H6200 (finding that "[m]ost of the

assumptions on which the current penalty structure was based have turned out to be unfounded"); *H6202 (statement of Rep. Daniel Lungren that "[w]e didn't really have an evidentiary basis for [the 100-to-1 ratio]"); *H6202 (statement of Rep. Bobby Scott that "there is no justification for the 100-to-1 ratio").  Another key rationale for the FSA was to ensure that minor crack offenders would not be punished more severely than major cocaine dealers.  *See* News Release, Office of Senator Jeff Sessions, *Congress Approves Landmark Drug Reform Compromise from Sessions and Judiciary Colleagues* (July 28, 2010) (available at http://sessions.senate.gov/public/index.cfm?FuseAction=PressShop. NewsReleases (stating "the disparity between crack and powder cocaine sentencing has now been significantly reduced to better and more strategically target federal resources at those who distribute wholesale quantities of narcotics").   Notably, a bill that would have specifically provided that it would not take effect for 180 days and would have had no retroactive application had been rejected earlier.  *See* H.R. 4545, 110th Cong. (1st Sess. 2007).

Senators Richard Durbin and Patrick Leahy clarified Congress's intentions in a letter to United States Attorney General Eric Holder dated Nov. 17, 2010 (available at http://sentencing.typepad.com/sentencing_law_and_policy/2010/11/senators-leahy-and-durbin-write-letter-to-attorney-general-holder-urging-application-of-fsa-to-pendi.html). Senators Durbin and Leahy acknowledge the "sense of urgency" that motivated the directive for the commission to promulgate emergency amendments, noting that "[e]very day that passes without taking action to solve this problem is another day that people are being sentenced under a law that virtually everyone agrees is unjust."  *Id*. at 1.  The Senators state that they are "disturbed" by the Department of Justice ("DOJ") position that

the FSA does not apply to defendants in cases pending at the time of the enactment, and characterize the result of the position as "absurd" and "obviously inconsistent with the purpose of the Fair Sentencing Act." *Id*. They urge the Attorney General "to seek sentences consistent with the Fair Sentencing Act" as a matter of prosecutorial discretion. *Id*.

The fairness of the Guidelines regime is heavily dependent on fair and reasonably consistent charging policies in the Department of Justice and the legitimate exercise of prosecutorial discretion. United States Sentencing Commission, *Fifteen Years of Guidelines Sentencing* (Fifteen-Year Assessment) at 89 (Nov. 2004). To that end, prosecutors have been directed to "charge and pursue the most serious, readily provable offense or offenses that are supported by the facts of the case, except in limited, enumerated circumstances." *Id*. at 24. Empirical evidence has shown that charging and plea bargaining practices continue to introduce significant disparities into the sentencing regime. *Id*., Executive Summary at xii. The Commission acknowledges that "[s]ince the power to determine the charge of conviction rests exclusively with the prosecution for the 85 percent of the cases that do not proceed to trial, mandatory minimums transfer sentencing power from the court to the prosecution" and "to the extent that prosecutorial discretion is exercised with preference to some and not to others," disparity is reintroduced into the system. United States Sentencing Commission, *Special Report to Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System* (Mand. Min. Rep't) (August 1991) at 1; see also *id*. at 14, 15 (noting that "the value of a mandatory minimum sentence lies not in its imposition, but in its value as a bargaining chip to be given away in return for the resource-saving plea from the defendant to a more leniently sanctioned

10

charge");  Fifteen-Year Assessment at 89 (noting that research over the past fifteen years has "consistently found that mandatory penalty statutes are used inconsistently in cases in which they appear to apply").

Before the FSA was passed, the DOJ recognized "the mounting evidence that the current cocaine sentencing disparity is difficult to justify based on the facts and science," and advocated  completely eliminating the sentencing disparity between crack and powder cocaine.  *Restoring Fairness to Federal Sentencing: Addressing the Crack-Powder Disparity: Hearing before the S. Judiciary Comm., Subcomm. on Crime and Drugs,* 11th Cong. 9-10 (April 29, 2009) (statement of Lanny A. Breuer, Assistant Attorney General, Criminal Division) (available at http://judiciary.senate.gov/hearings/testimony.cfm?id=3798&wit_id=7836 or sentencing.typepad.com/sentencing_law_and_policy/2009/04/dojs-basic-gameplan-while-urging-crack-sentencing-reform-from- congress.html).  The DOJ called for reassessment of the federal cocaine sentencing policy in light of evolving understanding of the effects of crack and powder cocaine and the need to ensure fundamental fairness in sentencing laws.  *Id.*, Breuer Statement at 3.  It stated that "[until a comprehensive solution—one that embodies new quantity thresholds and perhaps new sentencing enhancements—can be developed and enacted as legislation by Congress and as amended guidelines by the Sentencing Commission, federal prosecutors will adhere to existing law," but, recognizing that "federal courts have the authority to sentence outside the guidelines in crack cases or even to create their own quantity ratio in upcoming cases, . . . [o]ur prosecutors will inform courts that they should act within their discretion to fashion a sentence that is consistent with the objectives of 18 U.S.C. § 3553(a)." *Id.*

United States Attorney General Eric Holder stated in public remarks that "[i]t is the view of this Administration that the 100-to-1 crack-powder sentencing ratio is simply wrong. It is plainly unjust to hand down wildly disparate prison sentences for materially similar crimes.  It is unjust to have a sentencing disparity that disproportionately and illogically affects some racial groups."  Attorney General Eric Holder, Remarks as Prepared for Delivery by Attorney General Eric Holder at the D.C. Court of Appeals Judicial Conference (June 19, 2009) (available at www.usdoj.gov/ag/speeches/2009/ag-speech-090619.html.) The Attorney General later stated that "[t]here is no law enforcement or sentencing rationale for the current disparity between crack and cocaine powder offenses, and I have strongly supported eliminating it to ensure our sentencing laws are tough, predictable and fair," noting that he looked forward to "the Senate and the House approving this legislation quickly so that it can be signed into law."  Statement of the Attorney General on Senate Judiciary Committee's Approval of the FSA (March 11, 2010) (available at http://www.justice.gov/ag/speeches/2010/ag-speech-100311.html).  Earlier, Holder had testified before the Senate Judiciary Committee that "[t]he stakes are simply too high to let reform in this area wait any longer."  *Oversight of the Department of Justice: Hearing Before the S. Judiciary Comm.,* 111th Cong 10 (November 18, 2009) (statement of Attorney General Eric Holder) (available at http://www.justice.gov/ag/testimony/ 2009/ag-testimony-911181.html   or   http://judiciary.senate.gov/hearings/testimony. cfm?id=4172&wit_id=8318)

The Constitution's *ex post facto* clause "forbids the application of any law or rule that increases punishment to preexisting criminal conduct."  U.S. Const. Art. 1, § 9, cl. 3. "To fall within the *ex post facto* prohibition, a law must be retrospective—that is, 'it must apply

to events occurring before its enactment'—and it 'must disadvantage the offender affected by it,' by altering the definition of criminal conduct or increasing the punishment of the crime." *Lynce v. Mathis*, 519 U.S. 433, 441 (1997) (quoting *Weaver v. Graham*, 450 U.S. 24, 29 (1981)).  The Sentencing Guidelines are subject to the *ex post facto* clause.  *See United States v. Bell*, 991 F.2d 1445, 1452 (8th Cir. 1993).  Accordingly, retroactive application of harsher Guidelines violates the *ex post facto* clause.  *See id.* at 448.  Because an amendment to a Sentencing Guideline has the potential to increase a defendant's punishment for a crime committed prior to the amendment, the *ex post facto* clause is violated if a defendant is sentenced under the Guidelines in effect at the time of sentencing when those Guidelines produce a sentence harsher than one permitted under the Guidelines in effect at the time the crime is committed.  *Id*.

When the Supreme Court announces new rules of substantive or procedural law, those rules apply to all cases that are not yet final.  *Griffith v. Kentucky*, 479 U.S. 314 (1987).  A conviction does not become final until the expiration of direct review.  *See Kapral v. United States*, 166 F.3d 565, 577 (3d Cir. 1999).  This rule of retroactivity has "constitutional underpinnings."  *Danforth v. Minnesota*, 552 U.S. 264, 278 n.15 (2008).  One rationale for the rule is the actual inequity of violating the principle of treating similarly situated defendants the same.  *Griffith,* 479 U.S. at 323.

Under the criminal sentencing statutory scheme, the Sentencing Guidelines that govern a defendant's sentence are those in effect at the time of the sentencing.  18 U.S.C. § 3553(a)(4)(A)(ii); *see also* U.S.S.G. § 1B1.11, p.s.  Thus, in the two decades of the Guidelines' existence, whenever the Commission has adopted Guideline amendments, those amendments have applied to all defendants sentenced thereafter, regardless of

when the crime was committed.  *See, e.g.*, *United States v. Valladares*, 304 F.3d 1300, 1302 (8th Cir. 2002).  Because of *ex post facto* concerns, a district court must apply the guideline in effect at the time the crime was committed only if application of the guideline in effect at the time of sentencing would result in a more severe sentence.  *Id*.  Under the Sentencing Reform Act, the new Guideline reductions in base offense levels for trafficking in various quantities of crack cocaine will apply to all defendants sentenced after November 1, 2010.  18 U.S.C. § 3553 (a)(4)(A)(ii).

The Sentencing Commission is authorized under sentencing statutes to decide whether to amend the Guidelines, and to determine whether and to what extent an amendment will be retroactive.  *See* 28 U.S.C. § 994 (o) & (u); *Dillon v. United States*, 130 S. Ct. 2683, 2688 (June 17, 2010).  The Commission had amended the Guidelines for crack offenses in 2007, but had no authority to modify sentences imposed under the mandatory minimum statutes.  *See* Notice of Submission to Congress of Amendments to the Sentencing Guidelines effective November 1, 2007.  72 Fed. Reg. 28558-01, 2007 WL 1459813 28 (May 21, 2007); *United States Sentencing Commission Votes to Amend Guidelines for Terrorism, Sex Offenses, Intellectual Property Offenses, and Crack Cocaine Offenses* (April 27, 2007) (available at http://www.ussc.gov/Legislative_and_Public_ Affairs/Newsroom/Press_Releases/archives.cfm) (emphasizing the Commission's "strong view" that the amendment was only a partial solution to problems associated with the 100-to-1 drug quantity ratio and that "[a]ny comprehensive solution to the 100-to-1 drug quantity ratio would require appropriate legislative action by Congress").  The Commission later voted unanimously to give the 2007 Guidelines amendments lowering base offense levels for crack offenses retroactive effect, noting that it "made its decision on retroactivity of the

crack cocaine amendment after months of deliberation and years of examining cocaine sentencing issues" including over 33,000 letters or written comments and a full-day hearing. *U.S. Sentencing Commission Votes Unanimously to Apply Amendment Retroactively for Crack Cocaine Offenses* (Dec. 11, 2007) (available at http://www.ussc.gov/Legislative_and_Public_Affairs/Newsroom/Press_Releases/archive s.cfm).

Under common law, it was presumed that "the repeal of a criminal statute resulted in the abatement of 'all prosecutions which had not reached final disposition in the highest court authorized to review them.'" *Bradley v. United States*, 410 U.S. 605, 607 (1973) (noting that a prosecution terminates when a sentence is imposed). The first general saving provision was enacted in 1871 to abolish that presumption. *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 660 (1974) (noting that Congress enacted the savings statute to avoid abatements that were "often the product of legislative inadvertence").[6] The savings clause supplies a general rule of statutory construction that prescribes the effect of a repealing statute on an existing penalty in the absence of congressional intent to the contrary, in other words, it operates as a default rule. *See Great Northern Ry. Co. v. United States*, 208 U.S. 452, 465 (1908); *Martin v. United States*, 989 F.2d 271, 276 (8th Cir. 1993) ("Just as the rule of construction is inapplicable when Congress expressly intends a repeal to have immediate effect, we believe that resort

_____

[6]Unlike the statute at issue in *Marrero*, 417 U.S. at 659, there is no saving clause in the FSA itself. Also, there is another important distinction between *Marrero* and this case. In *Marrero*, the defendant had already been sentenced and was serving his sentence before the new law was enacted. *Id.* at 655. Under the law in effect at the time of Marrero's sentencing, the court understood he was not eligible for parole. *Id.* A statute that was enacted after he had been sentenced would allow parole, but the Supreme Court found that under the statute's own saving clause, as well as the general saving statute, the prohibition on parole would remain intact in Marrero's case. *Id.* at 658.

15

to this rule of construction may be unnecessary when Congress specifically provides that a statutory repeal will have purely prospective effect").  However, the savings statute need not be enforced if, "either by express declaration or necessary implication arising from the terms of the law as a whole, it results that the legislative mind will be set at naught by giving effect to the [saving statute]." *Great Northern Ry. Co,* 208 U.S. at 465.  The provision is to be interpreted, read, and construed "in order to give effect to the will and intent of Congress."  *Hertz v. Woodman*, 218 U.S. 205, 217 (1910).

Even with statutory language that is "clearly delineated," exceptions may be implied "where essential to prevent 'absurd results' or consequences obviously at a variance with the policy of the enactment as a whole." *United States v. Rutherford,* 442 U.S. 544, 552 (1979).  The Supreme Court imputes to Congress "an intention to avoid inflicting punishment at a time when it can no longer further any legislative purpose, and would be unnecessarily vindictive." *Hamm v. City of Rock Hill*, 379 U.S. 306, 308 (1965); *United States v. Chambers*, 291 U.S. 217, 222-23 (1934); *Massey v. United States*, 291 U.S. 608 (1934); *see also United States v. Mechem*, 509 F.2d 1193, 1196 (10th Cir. 1975) (finding that the stated purpose of a congressional enactment to avoid prosecution of juveniles as criminals and the enactment's recognition of a need for "immediate and comprehensive action," furnished the basis for the conclusion that "Congress did not intend the ordinary criminal process to continue, through the saving statute, to reach juveniles not yet tried."). Congress's intent to apply a statute to pending cases does not have to be expressed in the explicit language of the statute itself, but may be revealed by studying the context of the statute as a whole.  *See Lindh v. Murphy*, 521 U.S. 320, 326 (1997); *see also Abbott v. United States,* — U.S. —, 131 S. Ct. 18 (2010) (finding strong contextual support for its

interpretation of a statutory provision and stressing that a contrary reading "would result in sentencing anomalies Congress surely did not intend").

Where there is ambiguity in a criminal statute, doubts are resolved in favor of the defendant. *United States v. Bass*, 404 U.S. 336, 348 (1971) (describing the "rule of lenity"). The "rule of lenity" principle of statutory construction applies not only to interpretations of the substantive ambit of criminal prohibitions, but also to the penalties they impose. *Bifulco v. United States*, 447 U.S. 381, 387 (1980). Statutory interpretative principles should "give the rule of lenity special force in the context of mandatory minimum provisions," because an interpretive error on the side of leniency still permits the sentencing judge to impose a sentence that will serve all other sentencing goals set forth by Congress in other statutory provisions. *Dean v. United States*, 129 S. Ct. 1849, 1860-61 (2009) (Breyer, J., concurring); *see also* *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8, (2004) (ambiguities in criminal statutes referenced in immigration laws should be construed in the noncitizen's favor).

## ANALYSIS

The court finds that fundamental fairness requires the court to consider the Guidelines in effect at the time of the defendant's sentencing and the penalties under the FSA in fashioning a sentence for the defendant. Accordingly, the court finds that references to a quantity of over 5 grams in the indictment is surplusage and should be stricken. Under the FSA, only an allegation that the defendant possessed over 28 grams of crack cocaine would trigger a higher penalty and would be a fact that had to be set out in the indictment.

The court finds that the government's reliance on the savings clause for the proposition that the pre-amendment Guidelines apply is misplaced. The savings clause applies only in the absence of an expression of congressional intent. The court finds that it is clear in the text and structure of the Fair Sentencing Act, in conjunction with the other congressional enactments that comprise the overall federal criminal sentencing scheme, that Congress intended the FSA to apply to pending cases. This intention is expressed in its directive to the Sentencing Commission to promulgate emergency amendments conforming Guidelines penalties to the new statutory crack cocaine penalties.

The directive to the Commission was designed to ensure consistency in sentencing. The Commission had sought such emergency authority in its 2007 report, in order to "enable the Commission to minimize the lag between any statutory and guideline modifications for cocaine offenders." *See* 2007 Report at 9. The fact of the FSA's enactment is a recognition of the Supreme Court's admonition that it is up to Congress to remedy the anomalies created by a disconnect between statutory and Guidelines penalties and the legislative history of the FSA shows that the FSA is such a remedial attempt. The "consistency" that Congress sought to achieve through the directive to the Commission is a match between the statutory sentences and the Guidelines sentences for crack offenses. Though the FSA increased statutory triggering quantities, the resulting Guidelines offense levels remain pegged to the statutory mandatory minimum penalties. Congress had earlier enacted the statute that requires defendants to be sentenced under the Guidelines in effect at the time of sentencing, and was surely aware of that provision. The grant of emergency amendment authority to the Commission shows that Congress intended and expected that the new crack penalties would be applied as soon as possible.

18

The expressed goal of consistency is evidence of the underlying intent to apply the lower penalties provided in the FSA to pending cases, just as the amended Guidelines would be applied to pending cases. The directive indicates that Congress considered the interplay between the Guidelines and the FSA and anticipated that the statute and Guidelines would be congruent.

The legislative history of the FSA bolsters the court's conclusion. To devine congressional intent in these circumstances is not an arcane inquiry into antiquated archives. The congressional hearings and debate on this issue are recent, accessible and voluminous. Members of Congress have clearly elucidated their positions in public statements. The crack penalty reforms did not occur in a vacuum. Recent legal developments and changes in the sentencing climate are well known to the court and to the criminal bar.

The government's argument rests exclusively on the saving statute's provision that the repealing act "shall so expressly" provide that a previously harsher penalty is to be released or extinguished. Under the government's approach, the omission of such "express" language is the end of the statutory construction exercise. The government's argument ignores case law that explains that the 1871 saving clause "cannot justify a disregard of the will of Congress as manifested either expressly or by necessary implication in a subsequent enactment." *See Great N. Ry. Co.*, 208 U.S. at 465; *Marrero*, 417 U.S. at 659 n.10 (describing the *Great Northern* principle as applying to later congressional will manifested by "fair implication or expressly."). It would be illogical to ignore Congress's stated and implied objectives in order to exalt an overly technical interpretation of an old statute.

Doing so would also diminish the effectiveness of the remedial advisory Guidelines scheme as envisioned by the Supreme Court in recent cases. The change in sentencing jurisprudence in the wake of *Booker* signals the importance of returning sentencing discretion to the court. In the exercise of prosecutorial discretion, the government presents defendants with a Hobson's choice: either to enter a binding agreement to plead to a harsh Guidelines sentence or risk being subjected to an even more harsh mandatory minimum sentence. Under either scenario, sentencing discretion is removed from the court and placed squarely in the hands of the prosecutor. The defendant receives an illusory benefit from his plea to a lesser charge, while being sentenced as if he had pled to the greater charge. Uneven use of this discretion in charging and plea bargaining decisions reintroduces disparity into the system, relies inordinately on prosecutorial discretion, and hinders Congress's belated efforts to correct anomalies in sentencing, such as that created by the 100-to-1 ratio, through appropriate legislation.

A finding that the lowered penalties in the FSA are not applicable to pending cases defies logic. The statute of limitations for drug distribution offenses is five years. See 18 U.S.C. § 3282(a). Under the government's interpretation, a court would be required to impose sentences that are universally regarded as unfair and discriminatory, to all crack crimes committed in the five years prior to the date of the FSA'a enactment. Given the prevalence of lengthy, ongoing drug conspiracies, it is not unreasonable to assume that there will be a fair number of such prosecutions. Adopting the government's position would set up a two-tiered system of sentencing that is wholly at odds with the simplicity of the Guidelines provision that mandates the application of the Guidelines in effect at the time of sentencing, absent *ex post facto* concerns.

The government's argument blurs the distinction between a defendant who has already been sentenced and those defendants, like this one, who have yet to be sentenced, or even convicted.   Concerns about judicial economy and the finality of judgments could justify some limitations on reopening or relitigating sentences with respect to the former, but such concerns have no application where there is nothing to relitigate or reopen.   Judicial economy would be better served with a simple, straightforward rule that the FSA applies to pending cases, just as the Guidelines in effect at the time of sentencing will apply.   The provisions of the FSA that disadvantage an offender cannot be applied because of *ex post facto* concerns.   Judicial economy is not served by a piecemeal and ad hoc application of the FSA's various ameliorative and punitive provisions.   The government has not identified any valid congressional interest that would be served by continuing to apply the now discredited and repudiated 100-to-1 ratio to those defendants who are now categorized as minor crack offenders.

The savings clause is not to be applied in circumstances that lead to an absurd result.   Continuing to sentence defendants under a formula that has now been found unfair, unjust, unnecessary, and discriminatory is such an absurd result.   Application of the savings clause under these circumstances would have the result of setting the legislative mind "at naught."   It would frustrate the expressed congressional goals of remedying racially discriminatory impact, ensuring that more culpable offenders are punished more harshly, and achieving consistency between the statutory and Guidelines penalties.

Based upon the FSA's language and structure, legislative history, and motivating policies, as well as those of the Sentencing Reform Act of 1984, the court finds it was not the objective of Congress to have federal judges continue to impose sentences found to

be overly harsh after the enactment of the FSA to criminal conduct that occurred before its enactment.  Congress made it clear that amendments were urgent out of concern for fundamental fairness.  It is a necessary or fair implication from the urgency shown by the grant of emergency authority that Congress intended the FSA penalties and concomitant Guidelines base offense level adjustments to apply to pending cases.

To assign more force to the inclusion of the word "expressly" in the general saving statute, which at most is a neutral rule of construction or a default provision, than to the purpose, language, context, and legislative history of the FSA and the Sentencing Reform Act would produce an odd result and would render the emergency authority meaningless. The government points to no provision in the FSA that would indicate that Congress intended that the FSA would not apply to pending cases.  There is little force to the argument that the failure to mention retroactivity means that Congress must have intended the saving statute to prevent application of the FSA to pending cases.  It is just as likely that the omission of language on retroactivity means the opposite:  Congress knows how to include express language that an old law should continue to apply, as shown by the statute at issue in *Marrero*.

Moreover, even  if congressional intent were unclear, both the rule of lenity and the constitutional avoidance canon call for the FSA to be applied to pending cases.  To the extent that the statute is ambiguous, it should be construed in favor of a criminal defendant.  Application of the FSA to cases in the pipeline will also avoid any potential constitutional issue.  Applying the discredited 100-to-1 ratio to defendants who committed an offense before August 3, 2010, but who have not yet been convicted has Constitutional implications.  Arguably, both because penalties have disparate racial effects and because

22

offenders are treated differently, the Equal Protection Clause is implicated.  The Eighth Amendment may be implicated as well because the severity of the punishment is out of proportion to the culpability of a defendant who under the new law is recognized as a minor offender.  Most importantly, however, the continued application of a criminal penalty that fails to serve any legitimate governmental objective would be so arbitrary and irrational that it would violate a defendant's right to Due Process.  Also, because a defendant's maximum sentence, as well as the mandatory minimum sentence, is affected by the new penalties in the FSA, the Fifth and Sixth Amendment concerns addressed in *Apprendi*, 530 U.S. at 490, *Blakely v. Washington*, 542 U.S. 296, 301-02 (2004) and *Booker*, 543 U.S. at 260, are potentially implicated.

Finally, the government's present position is at odds with its professions to Congress and the public. The DOJ has publicly acknowledged that the pre-FSA penalties for crack cocaine are overly harsh, discriminatory, and unfair.  To now call for their continued application is inconsistent at best and hypocritical at worst.  The Department of Justice's present position is in irreconcilable conflict with its earlier statements.  Under the circumstances, the court finds the defendant's motion to strike surplusage should be granted.  Accordingly,

IT IS ORDERED that the defendant's motion to strike surplusage (Filing No. 33) is granted.

DATED this 1st day of February, 2011.

BY THE COURT:


s/Joseph F. Bataillon
Chief District Judge

23

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.